STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. VICTOR J. PACHECO, DEFENDANT-APPELLANT.

Argued December 18, 19, 1961—Reargued June 4, 1962—Decided July 3, 1962.

122

*Mr. J. Peter Davidow* argued the cause for the defendant-appellant.

*Mr. William Gallner,* Assistant Cumberland County Prosecutor, argued the cause for the plainitff-respondent (*Mr. Joseph H. Tuso,* Cumberland County Prosecutor, attorney).

The opinion of the court was delivered by

PROCTOR, J.   The defendant Victor Pacheco appeals from a conviction of murder in the first degree with a recommendation of life imprisonment.

The State charged that the defendant was a participant with Clarence Bobo Nelson (Bobo) in a robbery of Anibal Luiz Oliveria during which Bobo killed Oliveria.   Prior to the defendant's trial, Bobo pleaded *non vult* and was sentenced to life imprisonment.

At the trial the evidence showed that the defendant met Bobo while both were incarcerated in the Cumberland County jail during the summer of 1959.   When the defendant was released he returned to his former place of employment, a poultry farm near Bridgeton.   One day during the Labor Day week end beginning Friday, September 4, 1959, shortly after Bobo was released from pail, the defendant met Bobo in a bar in Bridgeton.   Later that night he took Bobo to the poultry farm and the two men shared the defendant's sleeping quarters.

Bobo was a State's witness.   His testimony was to the following effect:   While at the farm he told the defendant

he needed money and the defendant said he knew where there was a man living alone from whom he could get money if Bobo was willing "to take it." On Monday, September 7, 1959 (Labor Day), the two men were driven to the center of Vineland by the defendant's employer. With the defendant leading the way, the two men walked to the outskirts of the city where the defendant pointed out Oliveria's farmhouse. Bobo knocked on the door. When Oliveria came out, Bobo told him he wanted to buy some eggs. Then Bobo and the defendant followed Oliveria into the cellar of the farmhouse where the eggs were kept. As soon as they reached the cellar, Bobo grabbed Oliveria around the neck and "put a pen knife to his throat." When this happened the defendant ran out of the cellar into the yard. Bobo struggled with Oliveria and when the latter tripped and fell to the floor, Bobo picked up a stool and struck Oliveria over the head with it three times. After he tied the victim's hands and feet with twine, Bobo proceeded to take the money from the victim's pocket, place it in his own, and as he did, the defendant returned to the cellar. He and the defendant then left the cellar, entered the dwelling part of the house and Bobo proceeded to search for money while the defendant watched. When Bobo completed his search they left the house, Bobo taking a camera with him. Later that day, while they were in the Vineland bus station, Bobo gave the defendant $3.00 as his half of the money taken from Oliveria and threw the camera into a trush can. They then took a taxi to Bridgeton, drank beer in a barroom and parted company.

Oliveria's body was discovered in the cellar of his home two days after the crime was committed. It is undisputed the blows struck by Bobo caused his death.

Detective Thomas Jost and Chief Carl Ford of the Vineland police testified that after the defendant and Bobo were taken into custody, they volunteered to re-enact the crime. The police officers' description of the re-enactment was for the most part in accord with Bobo's testimony of what took

place at the Oliveria farmhouse. However, it differed as to the defendant's participation in the search of the house. Chief Ford corroborated Detective Jost's testimony that during the re-enactment the defendant not only searched the house but also "he (defendant) assisted Bobo in shaking the trunk that was standing on end, in the hopes of pushing it open. To search to see if there was any money in the trunk." On the other hand, Bobo testified that he alone "shook" the trunk both at the time the crime was committed and during the re-enactment. In fact, Bobo never said the defendant actively participated in the search.

Though several additional witnesses were called by the State, their testimony is not pertinent to the issues presented on this appeal.

The defendant testified on his own behalf. He acknowledged that Bobo stayed with him at the farm during the Labor Day week end, but denied having any conversation with Bobo about robbing anyone. His version was as follows: On Monday, September 7, 1959, Bobo asked the defendant to help him find a job on a farm in the area. After they were driven to Vineland by the defendant's employer, they began to walk, Bobo representing to the defendant that he thought he knew where he could get a job. On the way the defendant pointed out several farms where he thought Bobo might find work, but Bobo was not interested in those places. Finally, when they got to the Oliveria house Bobo said, "Let's go in here." After Bobo knocked on the door and Oliveria came out, Bobo said he wanted to buy two dozen eggs. Though the defendant could not understand why Bobo wanted eggs, he accompanied Bobo and Oliveria into the cellar to get them. Thereafter, when Bobo attacked Oliveria, the defendant ran out of the cellar into the yard. Later, when Bobo came out he said to the defendant, "Let's go inside the house." The defendant refused, but Bobo forced him into the house at knife point. Because of the knife the defendant felt compelled to stay with Bobo while the latter searched the

rooms. After leaving the house they went to the bus terminal in Vineland where Bobo gave the defendant $2.00 as his share of the taxi fare to Bridgeton. When they arrived in Bridgeton they went to a bar and later separated.

While defendant's appeal from his conviction was pending before us, the defendant's attorney received a letter from Bobo in which Bobo asserted that he alone was responsible for the crime and that the defendant was at no time a knowing participant. Thereafter, pursuant to a motion of the defendant, we remanded the matter to the trial court to hold a hearing upon the defendant's application for a new trial. We retained jurisdiction of the appeal in the event the trial court denied the application. The trial court denied the defendant's motion and accordingly the cause was returned to us.

The defendant urges a number of reasons for reversal of the judgment below and also contends that the motion for a new trial should have been granted. We are reversing on the grounds that the trial court erred in its ruling on defendant's proposed use on cross-examination of notes made by the State's witness, Detective Jost, and also because it erred in admitting evidence of the defendant's prior conduct to affect his credibility. It is therefore unnecessary to discuss all of the defendant's arguments. We shall, however, consider those points which may arise at the retrial.

Detective Jost was one of the key witnesses for the State. He testified that the defendant, during the re-enactment of the crime, actively assisted Bobo in the search for money in the Oliveria house. Clearly, this testimony was highly damaging to the defendant's assertion he did not participate in the crime. On cross-examination, Detective Jost stated that he had taken notes during the course of his investigation and had used them to refresh his memory in the morning before he testified. When the defendant asked for Jost's notes in order to further cross-examine him, the trial court said:

"I am telling you, sir, [defense counsel] and it is my under-
standing of the law of the State of New Jersey, that if you ask
for it [the notes] they [the State] will give it to you, and then
if you use it you are bound word for word what the statement says
because it will be your instrument."

As a result the defendant did not ask for or use Jost's notes
although they were available. The defendant contends the
court's ruling constituted legal error and prejudiced him
in conducting his defense.

The law in this State is clear that after a witness
for the prosecution has testified, the defendant in a criminal
case is entitled to inspect and use on cross-examination any
prior notes or statements made by the witness relating to
the subject matter of his direct testimony if they are or
can be made available. *State v. Hunt,* 25 *N. J.* 514,
530-531 (1958). And such use does not give rise to a
right in the State to introduce the notes or statements as
corroborative evidence on its behalf. *Id.,* at 531; see
*State v. Mucci,* 25 *N. J.* 423, 437-438 (1957). *A fortiori,*
a defendant is not "bound" by the contents of the notes
or statements used to cross-examine a witness. For surely
if the State is precluded from putting the matter in evi-
dence, the defendant cannot be forced to admit the truth
of the contents of the notes and statements of the adverse
witness. The extreme condition imposed by the trial court
virtually negated one of the defendant's most valuable aids
in exposing all that detracts from a witness' testimony. See
*Jencks v. United States,* 353 *U. S.* 657, 77 *S. Ct.* 1007,
1 *L. Ed.* 2*d* 1103 (1957). Accordingly, we hold that the
trial judge committed prejudicial error when he ruled the
defendant would be bound by the contents of Detective
Jost's notes if he used them.

The defendant contends that additional error was com-
mitted when the trial court permitted the State to elicit
from the defendant on cross-examination the fact that he
had been incarcerated in the county jail on a number of
occasions, and also that he had been AWOL (absent with-

out leave) while in military service. On direct examination the defendant testified that since coming to this country from Puerto Rico in 1951, he spent most of his time as a laborer on various farms in southern New Jersey. On cross-examination the State questioned the defendant at length regarding the various places where he lived since 1951. During this chain-of-residence questioning, the State was permitted, over defendant's objection, to expose the fact that he had spent time in the county jail on three different occasions: 90 days in the fall of 1951, 60 days in the spring and 90 days in the fall of 1952. The court in permitting this inquiry said the State was "merely testing his recollection and credibility as to where his residence was." The State was also allowed to show that the defendant had once been AWOL while serving in the United States Army. When the State introduced this element in the case, the following colloquy took place:

"MR. DAVIDOW [defense counsel]: I object to that most strenuously and I think that is highly prejudicial, and it is not an issue in this case, and it is not for the purpose of affecting credibility. What is the purpose of it?

MR. GALLNER [Assistant Prosecutor]: Affecting the credibility of the witness.

MR. DAVIDOW: I object to that, because it is not serviceable for that purpose.

THE COURT: If the Prosecutor states it is for the purpose of affecting credibility, I will allow the question.

Q. [by Mr. Gallner] Isn't that right, you were AWOL you call it in the army? AWOL?

A. Yes.

MR. DAVIDOW: I object. The Prosecutor is injecting character into this case and it serves no useful purpose as far as this charge is concerned.

THE COURT: It has nothing to do with character, it is merely to test his credibility. In the ultimate end you [jury] will have to give credence to what you have heard here, because there is an evaluation of testimony, and credence is one of the issues that a jury has to decide.

This doesn't say that he is not credible. He may be very credible, because a person who is AWOL or been in jail can be a very honest man and tell the truth, but the jury is the one who weighs it.

You may proceed."

■ It is clear to us the State's purpose in cross-examining the defendant in the above respects was not to test his recollection and thus to affect his credibility. Rather, its purpose was to depict the defendant as an unsavory character, a man at odds with the law. This is clearly pointed up by the prosecuting attorney's remarks in his summation to the jury when he referred to the defendant as:

"* * * Victor Pacheco, the gentleman who wasn't in this country but a couple of months before he landed in jail, Victor Pacheco who during the time that he has been here since 1951 spent month after month after month in the county jail, this paragon of virtue."

This reference to the defendant's character which had no place in the case, *State v. Kociolek,* 23 *N. J.* 400, 420 (1957), serves as a striking example of why the trial court erred in permitting an inquiry into the defendant's experience with the law. In addition, the trial court instructed the jury they could consider the fact that the defendant had been in jail in determining whether he was an honest man. This too was a use far exceeding that for which the inquiry was permitted by the court. The resulting prejudicial effect to the defendant's rights by these references to his AWOL and stays in the county jail far outweighed any advantage to be gained by testing the defendant's credibility. See *State v. Bucanis,* 26 *N. J.* 45, 53 (1958); *McCormick, Evidence* 319 (1954). The State did not show the defendant had been convicted of a crime. See *N. J. S.* 2A:81-12. Instead, it sought to achieve the same result by showing the defendant had been lodged in the county jail and had been subject to military discipline. Such evidence is not proof of a conviction of a crime. In any event, defendant's stays in the county jail were probably the result of disorderly person offenses and therefore inadmissible to attack his credibility. *State v. Tune,* 17 *N. J.* 100, 111 (1954); *State v. Block,* 119 *N. J. L.* 277, 282 *(Sup. Ct.* 1938), aff'd 121 *N. J. L.* 73 *(E. & A.*

1938). And AWOL cannot have any greater probative value. In our opinion, the cross-examination conducted here severely undermined the defendant's right to a fair trial. See *State v. Kociolek, supra,* at *pp.* 417–420. Therefore, we hold it was error for the trial court to permit cross-examination regarding the defendant's stays in the county jail and his unauthorized absence while in military service.

In view of our conclusion that the judgment below must be reversed for the reasons discussed above, we will only consider those points advanced by the defendant which may arise at the retrial.

The defendant contends that the special panel from which the jury was selected was not drawn from the general panel in accordance with *N. J. S.* 2A:74–9 as interpreted by this court in *State v. Kociolek, supra.* The statute provides that in all cases in which the defendant is entitled to 20 peremptory challenges and to have a list of the jury delivered to him previous to his trial, as in the present case, the sheriff shall draw a list of 48 jurors, or such larger number as is directed by the court, from the general panel, which list shall constitute the special panel from which the jury in the cause will be selected.

The Assignment Judge of Cumberland County, pursuant to his authority under *N. J. S.* 2A:71–9, entered an order on May 18, 1960, providing that two distinct panels of 75 jurors each would be designated from 150 persons drawn to sit for service as petit jurors during the stated session commencing September 8, 1960, and terminating December 31, 1960. The order stated:

"The first 75 so drawn shall constitute the general panel for the period between September 8, 1960 and October 31, 1960, both inclusive and shall be known as Panel A. The second 75 so drawn shall constitute the general panel for the period between November 1, 1960 and December 31, 1960, both inclusive and shall be known as Panel B."

On November 29, 1960, pursuant to the court's direction, the defendant was served with a list of 58 jurors selected from Panel B. The defendant contends that such procedure was declared erroneous by this court in *Kociolek*. He asserts that under that decision he was entitled to a special panel selected from the aggregate of jurors on Panels A and B.

We believe the procedure followed by the trial court was proper. In *Kociolek,* this court reversed a conviction in a murder case because the requirements of *N. J. S.* 2A:74–9 were not satisfied where the special panel was not selected from the entire general panel. In that case the assignment judge ordered a single general panel to sit for the entire stated session. · He divided the general panel into four separate petit jury panels: two panels to serve for the trial of criminal causes and two panels to serve for the trial of civil causes. The special panel for the *Kociolek* trial was selected from only one of the criminal panels, *i. e.,* one-fourth of the general panel. This court held that the special panel should have been selected from all four panels which in the aggregate constituted the general panel. In the present case, the special panel was selected from the entire general panel constituted to sit at the time the special panel was selected.

We believe the assignment judge is empowered to designate a number of panels of petit jurors with specific direction that the panel sitting for a specified portion of the stated session constitutes the general panel during that period. *N. J. S.* 2A:74–9 is satisfied when the special panel is drawn from all of the jurors scheduled to sit as the general panel during the period in which the case is to be tried.

The defendant asserts the trial judge erred in admitting into evidence photographs of the decedent, the stool used as the murder weapon and the twine with which the decedent was bound because the evidence served only to inflame the jury. So long as this type of evidence is

relevant to the State's case its admission is a matter which lies mainly within the discretion of the trial judge and his ruling will not be overturned unless he has abused his discretion. *State v. Smith,* 32 *N. J.* 501, 525 (1960). We see no reason to disturb the trial court's ruling.

At the trial the defendant submitted a number of requests for charge to the jury. He asserts the trial judge erred in denying them. From our examination of the trial court's charge, we are satisfied that it adequately incorporated the substance of defendant's requests. However, our examination of the charge discloses that the trial court instructed the jury regarding: premeditated, deliberate and willful killing; killing in committing or attempting to commit robbery; second degree murder; and manslaughter. On the evidence produced in this case the only issue was the defendant's guilt or innocence of a felony-murder. See *N. J. S.* 2A:113–1. Therefore, the trial court should have charged the jury on that thesis with directions to acquit the defendant or find him guilty of first-degree murder. See, *e. g., State v. Giampietro,* 107 *N. J. L.* 120 (*E. & A.* 1930); *State v. Carlino,* 98 *N. J. L.* 48 (*Sup. Ct.* 1922), aff'd 99 *N. J. L.* 292 (*E. & A.* 1923).

The judgment of conviction is reversed and the cause remanded to the Cumberland County Court for a new trial.

*For reversal*—Chief Justice WEINTRAUB, and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN—7.

*For affirmance*—None.