STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. JUAN
RAMOS CRISANTOS, A/K/A JUAN CRISANTOS RAMOS,
A/K/A FLORENTINO ARRIAGAS, DEFENDANT-APPELLANT.

Argued October 22, 1985—Decided May 6, 1986.

266

*Lowell Espey,* Designated Counsel, argued the cause for appellant (*Thomas S. Smith, Jr.,* Acting Public Defender, attorney).

*Steven E. Braun,* Assistant Prosecutor, argued the cause for respondent (*Joseph A. Falcone,* Passaic County Prosecutor, attorney).

The opinion of the Court was delivered by

STEIN, J.

Appellant was indicted for the murder and robbery of Ramon Torres. Francisco Ruiz was also indicted for those offenses,

but was never apprehended. After the trial court declined defense counsel's request to charge manslaughter, *N.J.S.A.* 2C:11–4, a jury convicted appellant of felony murder and first-degree robbery. The Appellate Division affirmed the conviction, concluding that appellant was entitled to the manslaughter charge but that the trial court's failure to give the charge was harmless error because passion/provocation manslaughter "is not available to reduce a robber's accountability for murder when someone is killed in the course of or immediate flight from the robbery." 198 *N.J.Super.* 575, 583 (1985). We now affirm appellant's conviction, but do so because the evidence would not have afforded the jury a rational basis for convicting appellant of passion/provocation manslaughter. *N.J.S.A.* 2C:1–8(e). Consequently, the trial court did not err in declining to charge the jury with passion/provocation manslaughter.

I

Ramon Torres, a 54-year-old unemployed auto mechanic, was robbed and brutally murdered on his way home from a bar during the early morning hours of April 9, 1982. He died of internal bleeding caused by multiple stab wounds to the chest.

Appellant and Ruiz were indicted for first-degree armed robbery and murder. Count one of the two-count indictment alleged that appellant and Ruiz robbed Torres while armed with a knife, *N.J.S.A.* 2C:15–1. The second count charged defendants with "knowingly" killing Torres, *N.J.S.A.* 2C:11–3(a)(2), "and/or" causing his death in the course of a robbery, *N.J.S.A.* 2C:11–3(a)(3).

The State and defense offered sharply conflicting versions of the events pertinent to the crime. The evidence presented by the State suggested that appellant and Ruiz attacked the victim while he was walking home alone from a bar, disabled him by breaking his ankle, and then robbed him of his jewelry and wallet. When the State's principal witness, Nicholas Santana, approached the scene, the perpetrators hid nearby. Santana

found Torres beaten but conscious, with no serious wounds other than a broken ankle.[1]  Torres told Santana that the men who robbed him were the same two men who had robbed him two weeks earlier.  Santana left Torres in order to call the police from a phone booth across the street.  When he returned, he saw two men on top of Torres; they appeared to be stabbing him repeatedly.  Santana threatened the two men with a broken fence post and they fled.  When the police arrived, they discovered that Torres had been stripped of all valuables and identification and was bleeding profusely from multiple stab wounds of the face and chest.[2]  The broken-off blade of a knife was found in Torres' overcoat.  Torres died shortly thereafter at the hospital.[3]

The prosecutor theorized that Santana had chanced upon the tail end of the robbery.  He suggested that the assailants, fearing that Torres could identify them, returned to kill him while Santana was in the telephone booth.  By its verdict, the jury apparently accepted the State's theory.

The defense presented an entirely different version of the facts.  Appellant admitted being on the scene, but denied either robbing or killing Torres.  He testified that Torres had instigated a fight by shouting "dirty words" and ethnic epithets [4] as he and Ruiz walked by.  Arriagas testified that he responded to Torres' comments by confronting him, and then walked away.

---

[1]According to the medical examiner's testimony, "[t]he right ankle was dislocated.  The right foot was sort of almost separated from the rest of the leg at the ankle and sort of gave a jagged appearance where it was separated from the rest of the leg at the ankle."

[2]The medical examiner testified that Torres had been stabbed at least eleven times.

[3]At trial, counsel stipulated that Torres' autopsy report disclosed a blood alcohol content of .207.

[4]Arriagas claimed Torres repeatedly called him a "Mexican shit" and "motherfucker."

When Torres followed him, Arriagas challenged Torres to fight, retaliating after Torres attempted to land the first blow. According to Arriagas, Torres kicked him in the leg and Arriagas hit Torres in the eye and face, knocking him down. Then Ruiz pushed Arriagas aside and stabbed Torres "three or four times." Arriagas said he ran from the scene only because Ruiz ran. The defense characterized Arriagas as guilty of, at most, simple assault.

Arriagas' claim that Ruiz had acted alone in killing Torres was corroborated by four men who shared with Ruiz an apartment overlooking the scene of the murder. Their testimony was weakened by internal contradictions and prior inconsistent statements each had given the police.[5]

The trial court instructed the jury to consider appellant's guilt of knowing or purposeful murder, felony murder, and robbery, but refused defense counsel's request to charge the jury on manslaughter:

> There's no such evidence. He didn't die from the fight. He died from the stab wounds. Your own client said that he was all right after the fight * * * and, as a matter of fact, your client delineates his activity from the stabbing. There's no manslaughter here.

In accordance with the trial court's instruction to consider appellant's guilt of purposeful or knowing murder only if it acquitted appellant of felony murder,[6] the jury found appellant guilty of felony murder and first-degree robbery and did not

---

[5]During summation the prosecutor suggested that the blame-it-on-Ruiz story was concocted to protect Arriagas after the four witnesses, one of whom was Ruiz' brother, confirmed that Ruiz had fled to Mexico.

[6]As the Appellate Division noted, 198 *N.J.Super.* at 578 n. 1, the jury instruction on "purposeful" murder was in error because the indictment charges only "knowing" murder. Purposeful murder is not an included offense of knowing murder, see *N.J.S.A.* 2C:1–8(d), and purposeful murder must therefore be charged in the indictment. See *R.* 3:7–3(b) (every indictment for murder must specify whether it is based on *N.J.S.A.* 2C:11–3(a)(1), (2), or (3) (establishing separate mental elements for purposeful and knowing murder)). The error here, however, was harmless because the jury, having found felony murder, never returned a verdict on purposeful or knowing murder.

consider purposeful or knowing murder. The trial court sentenced appellant to an extended term of fifty years for the felony-murder conviction, with a twenty-five-year period of parole ineligibility, and imposed a consecutive twenty-year term for the robbery conviction.

Although the Appellate Division affirmed the conviction, it agreed with appellant that the trial court, under *State v. Powell*, 84 *N.J.* 305 (1980), should have given the jury a manslaughter instruction because the jury had been given the option of convicting for purposeful or knowing murder. 198 *N.J.Super.* at 582. The court concluded that the error was harmless because the jury never considered purposeful or knowing murder, but convicted appellant of felony murder, a crime not amenable to mitigation based on provocation or passion. *Id.* at 583–84. However, the Appellate Division remanded the case to the trial court for resentencing, concluding that because the conviction for robbery necessarily merged with the felony-murder conviction, it was plain error for the trial court to have imposed a separate sentence for armed robbery. *Id.* at 579.

II

Although our ultimate disposition of this appeal does not require us to consider the Appellate Division's conclusion that failure to charge passion/provocation manslaughter was harmless error in this case, we are constrained to comment on the issue because of its recurrence. We most recently considered this question in *State v. Grunow*, 102 *N.J.* 133 (1986), holding that a jury instruction erroneous as to burden of proof when passion/provocation manslaughter is charged as a lesser-included offense is not harmless error where the jury acquitted defendant of murder and convicted him of aggravated manslaughter. *Cf. State v. Vujosevic*, 198 *N.J.Super.* 435, 444–46 (App.Div.1985) (failure to charge aggravated assault is harmless error where jury, charged with murder, aggravated man-

slaughter, and manslaughter, convicts defendant of aggravated manslaughter); *State v. Selby,* 183 *N.J.Super.* 273 (App.Div. 1981) (failure to charge jury with second degree murder and manslaughter is not harmless error where jury convicts of first degree murder, kidnapping, and abduction).

*State v. Powell, supra,* 84 *N.J.* at 316–19, 322, applying common-law principles because the offense antedated the effective date of the Code of Criminal Justice (Code), suggests that if there is plausible evidence in the record to support a conviction of a lesser degree of criminal homicide, and a jury instruction on the lesser offense is requested, it is error not to submit that issue to the jury. "A defendant is entitled to such instruction whether or not manslaughter is consistent with the theory of his defense." *Id.* at 317. In this case, the Appellate Division applied the *Powell* principle in determining that appellant's right to a manslaughter charge was not forfeited simply because appellant claimed that the victim's death was caused solely by Ruiz. The court reasoned that appellant's testimony as to the provocation that caused him to fight Torres could be combined with the State's evidence that he killed Torres so as to present a jury issue warranting a charge of passion/provocation manslaughter. The court then concluded that since the jury convicted appellant of felony murder, *N.J.S.A.* 2C:11–3(a)(3), based on his participation in the robbery of Torres, the failure to charge manslaughter was harmless error because felony murder could not be mitigated to manslaughter by proof of passion/provocation.[7]

---

[7]The Code provides that manslaughter exists when "[a] homicide which would otherwise be murder under section 2C:11–3 [which includes purposeful, knowing, and felony murder] is committed in the heat of passion resulting from a reasonable provocation." *N.J.S.A.* 2C:11–4(b)(2). Although this provision literally subsumes felony murder among those murders capable of being mitigated to manslaughter, it is clear that the Legislature intended to codify the existing case-law definition of passion/provocation manslaughter in enacting section 2C:11–4(b)(2). As originally drafted, this section was identical to the Model Penal Code § 210.3 and "substantially enlarged" the class of murders

■ This conclusion does not accord adequate recognition to the critical role of the jury in a criminal case. We have noted that the jury serves as "the conscience of the community and the embodiment of the common sense and feelings reflective of society as a whole," *State v. Ingenito*, 87 *N.J.* 204, 212 (1981). A jury may acquit or convict on a lesser charge although satisfied that the State has proven its case on the greater charge beyond a reasonable doubt. *See United States v. Desmond*, 670 *F.*2d 414, 416–18 (3d Cir.1982); *State v. Ingenito, supra,* 87 *N.J.* at 212; *State v. Simon,* 79 *N.J.* 191, 207–08 (1979); *cf. United Brotherhood of Carpenters & Joiners of America v. United States,* 330 *U.S.* 395, 408, 67 *S.Ct.* 775, 782, 91 *L.Ed.* 973, 985 (1947) (a judge may never direct a verdict of guilty); *United States v. Spock,* 416 *F.*2d 165, 180–83 (1st Cir.1969) (submitting special jury findings in criminal case is prejudicial error when special finding may inhibit jury's ability to "look at more than logic"). A criminal jury may return "a verdict of innocence in the face of overwhelming evidence of guilt," *State v. Ingenito, supra,* 87 *N.J.* at 212, or it may return illogical or inconsistent verdicts that would not be tolerated in civil trials. *United States v. Powell,* —— *U.S.* ——, ——, 105 *S.Ct.* 471, 476–78, 83 *L.Ed.*2d 461, 467–69 (1984); *Dunn v. United States,* 284 *U.S.* 390, 393–94, 52 *S.Ct.* 189, 190–91, 76 *L.Ed.* 356, 358–59 (1932); *State v. Ingenito, supra,* 87 *N.J.* at 211–12; *State v. Simon, supra,* 79 *N.J.* at 208.

---

eligible for mitigation to manslaughter—although even under the enlarged category, it is unclear whether felony murder could have been reduced to manslaughter. *See Final Report of the New Jersey Criminal Law Revision Commission,* Vol. II: *Commentary* (1971) at 159–62. The Legislature, however, rejected the proposed section 2C:11–4 in favor of a more restrictive manslaughter definition that codifies the pre-Code understanding. *See, e.g., State v. King,* 37 *N.J.* 285, 299–302 (1962) (pre-Code definition of provocation manslaughter). Since provocation mitigated or explained the "malice" of willful murder, *State v. Bonano,* 59 *N.J.* 515, 523 (1971), and no intent was required in felony murder except the intent to commit the underlying felony, *State v. Madden,* 61 *N.J.* 377, 385 (1972), the accepted rule was that felony murder could not be mitigated to manslaughter by proof of provocation. W. LaFave & A. Scott, *Handbook on Criminal Law* § 76, at 572 n. 3 (1972).

Accordingly, the fact that the jury in this case convicted appellant of felony murder does not necessarily mean that it would have returned the same verdict if manslaughter had also been charged. It had the power, for example, to return arguably inconsistent verdicts of robbery and manslaughter or to have acquitted for robbery and convicted for manslaughter alone. In general, it is speculative to forecast what verdict a jury would have returned if properly instructed on the basis of the verdict that a jury returned after an incomplete instruction. *State v. Grunow, supra,* 102 *N.J.* at 148. We have cautioned that " '[a]ppropriate and proper charges to a jury are essential for a fair trial,' " *State v. Collier,* 90 *N.J.* 117, 122 (1982) (quoting *State v. Green,* 86 *N.J.* 281, 287 (1981)), and erroneous instructions on material issues are presumed to be reversible error, excusable only if they are harmless beyond a reasonable doubt. *Id.* at 122–23. Such errors are "poor candidates for rehabilitation under the harmless error philosophy." *State v. Simon, supra,* 79 *N.J.* at 206.

### III

Notwithstanding our disagreement with the Appellate Division's application of the harmless-error rule in this case, our review of the record convinces us that appellant was not entitled to a passion/provocation manslaughter instruction. As we have noted, a jury, once properly charged, has the power to disregard even overwhelming proof of culpability and either acquit entirely or convict of a lesser-included offense. However, a court is not obligated to, indeed should not, instruct a jury to return a verdict that would clearly be unwarranted by the record. *See Sparf v. United States,* 156 *U.S.* 51, 101–02, 15 *S.Ct.* 273, 293, 39 *L.Ed.* 343, 361 (1895); *State v. Sinclair,* 49 *N.J.* 525, 540 (1967); *People v. Mussenden,* 308 *N.Y.* 558, 563, 127 *N.E.2d* 551, 554 (1955); *cf. State v. Christener,* 71 *N.J.* 55, 67–73 (1976) (to avoid an unwarranted compromise verdict, a trial court should not instruct a jury to consider a more serious offense than the record supports).

The standard that determines whether murder may be reduced to manslaughter by reason of passion resulting from provocation is well settled:

> Voluntary manslaughter is a slaying committed in a transport of passion or heat of blood induced by an adequate provocation, provided the killing occurs before the passage of time sufficient for an ordinary person in like circumstances to cool off. *State v. King, supra* (37 *N.J.*, at pp. 300–01); *State v. Wynn,* 21 *N.J.* 264, 270 (1956); *Perkins, Criminal Law* 43, 53 (1957); 1 *Warren, Homicide* §§ 90–91, p. 433 (1938). The common law deemed such circumstances to negate the malice required for murder. Involved is a concession to the frailty of man, a recognition that the average person can understandably react violently to a sufficient wrong and hence some lesser punishment is appropriate. See *State v. Williams,* 29 *N.J.* 27, 42–43 (1959). [*State v. Guido,* 40 *N.J.* 191, 209–10 (1963).]

The generally-accepted rule is that words alone, no matter how offensive or insulting, do not constitute adequate provocation to reduce murder to manslaughter. 2 C. Torcia, *Wharton's Criminal Law* 245 (14th ed.1979) (hereafter *Wharton's Criminal Law*); 1 O. Warren and B. Bilas, *Warren on Homicide* 473–76 (perm.ed.1938) (hereafter *Warren on Homicide*); Annot., 2 *A.L.R.*3d 1292 (1965). We have followed this rule in New Jersey. *State v. Bonano,* 59 *N.J.* 515, 524 (1971); *State v. King,* 37 *N.J.* 285, 301 (1962); *Clifford v. State,* 60 *N.J.L.* 287, 290–91 (Sup.Ct.), aff'd, 61 *N.J.L.* 217 (E. & A.1897); *Warner v. State,* 56 *N.J.L.* 686, 691 (E. & A.1894).

Another common-law rule was that mutual combat under certain circumstances could constitute adequate provocation to reduce murder to manslaughter. *Model Penal Code,* § 210.3 comment at 57 (Official Draft and Revised Comments, 1980) (hereafter cited as *MPC*); Note, "Manslaughter and the Adequacy of Provocation: The Reasonableness of the Reasonable Man," 106 *U.Pa.L.Rev.* 1021, 1031–32 (1958); 2 *Wharton's Criminal Law, supra,* § 158 at 252; 1 *Warren on Homicide, supra,* § 110 at 522–28. However, "to reduce the offense from murder to manslaughter the contest must have been waged on equal terms and no unfair advantage taken of the deceased. * * The offense is not manslaughter but murder where the defendant alone was armed; and took an unfair advantage of the

deceased." 1 *Warren on Homicide, supra,* § 110 at 525–26. Another authority expresses the same rule in these terms: "But if a person, under color of fighting on equal terms, kills the other with a deadly weapon which he used from the beginning or concealed on his person from the beginning, the homicide constitutes murder." 2 *Wharton's Criminal Law, supra,* § 110 at 254.[8]

Obviously, abstract rules are only guides in defining the parameters of passion/provocation manslaughter. The specific evidence in each case must be carefully evaluated in the context of the entire record to determine whether passion/provocation manslaughter may properly be considered by the jury.

■ Because the issue of passion/provocation can arise in an infinite number of factual settings, mitigation of homicide because of passion/provocation is ordinarily a question for the jury, unless the evidence is so weak as to preclude jury consideration. *State v. Sinclair, supra,* 49 *N.J.* at 540. The applicable standard for determining whether the trial court should charge the jury with manslaughter is that set forth in the Code, *N.J.S.A.* 2C:1–8(e):

> The Court shall not charge the jury with respect to an included offense unless there is a rational basis for a verdict convicting the defendant of the included offense.

---

[8]Yet another formulation of the rule of mutual combat is the following:

> If the fight is really "mutual" in the sense that both enter into it willingly, as distinguished from the case in which one is clearly attacking and the other merely defending; if the intent to kill or to inflict great bodily injury is formed in the heat of the encounter, rather than in advance, and the slayer does not deliberately take unfair advantage of the other by secretly arming himself with a weapon to have ready "just in case"; and if the encounter reaches the proportion of actual physical contact, or dangerous threat of serious and immediate harm, sufficient to arouse the passions of a reasonable man, the law takes the position that in such mutual combat there is mutual provocation. [R. Perkins, *Criminal Law,* § 1 at 59 (2d ed.1969).]

The Code's language is derived from an earlier draft of the Model Penal Code,[9] amended in the Model Penal Code's final text by the addition of the phrase "be obligated to" after the words "The Court shall not". The Commentary to the Model Penal Code explains the purpose of this amendment:

> As originally drafted, the subsection provided that the "Court *shall not charge the jury*," the reporter being of the view that if the evidence "would not justify any other verdict except a conviction of that offense or an acquittal, it would be improper to instruct the jury with respect to included offenses" and might constitute "an invitation to the jury to return a compromise or otherwise unwarranted verdict." The words "be obligated to" following "The Court shall not" were added to allow a court to submit an illogical included offense if the court believes that it is proper to do so. This, in effect, recognizes the jury's right to return a compromise verdict, a view supported by the majority of the Institute at the 1956 Annual Meeting. [*MPC* § 1.07 comment at 134 (footnotes omitted).]

■ Our Code did not adopt the revised version of the Model Penal Code, reflecting an unwillingness to accede to the reasoning offered to support the revision. Accordingly, under our Code it is improper for a trial court to charge manslaughter, even when requested by the defendant, if there is no evidence in the record to support a manslaughter conviction. *Cf. State v. Powell, supra,* 84 *N.J.* at 316 n. 12 (pre-Code). To warrant the charge, there must be a "rational basis" for a manslaughter verdict. *Cf. State v. Saulnier,* 63 *N.J.* 199, 206–07 (1973) (pre-Code case citing *MPC* § 1.07(5) (Proposed Official Draft, 1962) for the principle that "there need not be a jury charge with respect to an included offense unless there is a rational basis in the evidence for a finding that the defendant was not guilty of the higher offense charged but guilty of the lesser included offense."); *State v. Bohannan,* 206 *N.J.Super.* 646 (App.Div.1986) (where there is a rational basis in the evidence to support a conviction of second-degree robbery, it is "reversible error for trial court upon request to refuse to charge second degree robbery."); *Commonwealth v. Hogg,* 365 *Mass.* 290, 294, 311 *N.E.*2d 63, 67 (1974) ("Where there is no 'rational

---

[9]*MPC* § 1.08 (Tent. Draft No. 5, 1956).

basis for a verdict acquitting the defendant of the offense charged and convicting him of the included offense,' no instruction need be given on the lesser offense.") (quoting *MPC* § 1.07(5) (Proposed Official Draft, 1962)); *Ross v. State*, 61 *Wis.*2d 160, 171, 211 *N.W.*2d 827, 833 (1973) ("The question basically is whether a jury giving the evidence full credence could reasonably return a verdict of guilty on the lesser included offense.").

The *Commentary* to the *Final Report of the New Jersey Law Revision Commission* makes it clear that the "rational basis" standard was intended to be consistent with pre-Code law as articulated in *State v. Sinclair, supra:*

> Subsection e states that the Court shall not charge the jury on an included offense unless there is a rational basis for a verdict acquitting the defendant of the offense charged and convicting him of the included offense. This is in accord with the New Jersey rule which is found in *State v. Sinclair*, 49 *N.J.* 525, 540 (1967):
>
> > "When the State's thesis is that the murder occurred during a robbery or attempted robbery, the evidence at trial may be such that only by sheer speculation or compromise could the jury return a verdict other than guilty of first degree murder or not guilty; if so, it is proper not to instruct the jury that second degree murder is a possible verdict .... However, our cases also establish that if on the evidence it would not be *idle* to have the jury decide whether defendants committed an unlawful homicide other than in the course of an attempt to rob, it is error not to charge the possibility of second degree murder...."
>
> See also *State v. Mathis*, 47 *N.J.* 455, 466 (1966); *State v. Davis*, 50 *N.J.* 16 (1967); *State v. Pacheco*, 38 *N.J.* 120, 131 (1962); *State v. Wynn*, 21 *N.J.* 264, 270 (1956); *State v. Sullivan*, 43 *N.J.* 209, 245 (1964).[10] [*Final Report of the New Jersey Law Revision Commission*, Vol. II: *Commentary* (1971), § 2C:1–7 at 26.]

---

[10]We attribute no significance to the difference in phraseology between the Model Penal Code ("rational basis for a verdict acquitting the defendant of the offense charged and convicting him of the included offense") and our Code ("rational basis for a verdict convicting the defendant of the included offense") especially in view of the *Commentary's* treatment of the two as equivalent. The *Commentary*, as quoted above, refers to that subsection as if it read "rational basis for a verdict acquitting the defendant of the offense charged and convicting him of the included offense."

In *Sinclair*, the Court determined that "if on the evidence it would not be *idle* to have the jury decide" whether a defendant had committed a lesser-included offense, it is error not to charge the lesser-included offense. *State v. Sinclair, supra,* 49 *N.J.* at 540. In concluding that the charge would not be idle in that case, the Court observed that "it is enough that the evidence [supporting the lesser-included offense charge] leaves room for dispute * * * ." *Id.* at 542 (citing *State v. Mathis,* 47 *N.J.* 455, 466–67, (1966)).

■ In *State v. Powell*, we noted that in a majority of jurisdictions, "a scintilla of evidence" is all that is necessary to warrant a manslaughter charge when requested by the defendant. 84 *N.J.* at 316 n. 12. To the extent that *Powell* is read as supporting the "scintilla" test, the Code formulation is somewhat more restrictive. Nevertheless, the rational-basis test of the Code imposes a low threshold, as did the pre-Code law, *State v. Sinclair, supra,* 49 *N.J.* at 540, for permitting a charge on a lesser-included offense. When the lesser-included offense charge is requested by a defendant, as in this case, the trial court is obligated, in view of defendant's interest, to examine the record thoroughly to determine if the rational-basis standard has been satisfied. *See State v. Powell, supra,* 84 *N.J.* at 318–19; *State v. Choice,* 98 *N.J.* 295, 298–99 (1985).

■ In our view, the evidence in this case would not have afforded the jury a rational basis for convicting appellant of passion/provocation manslaughter.[11] Appellant testified that

---

[11]Defense counsel asked the trial judge to charge manslaughter on the basis that the jury could find that defendant killed the victim in the course of the fight. Since the requested charge was not limited to passion/provocation manslaughter, it could have encompassed aggravated manslaughter, *N.J.S.A.* 2C:11–4(a) ("[A]ctor recklessly causes death under circumstances manifesting extreme indifference to human life."), or reckless manslaughter, *N.J.S.A.* 2C:11–4(b) ("Criminal homicide constitutes manslaughter when it is committed recklessly."). We focus on passion/provocation manslaughter since the failure to charge that form of manslaughter was asserted as error in appellant's petition for certification. However, we find no rational basis in this record for a

his encounter with Torres was provoked by "dirty words" and ethnic slurs. He further testified that he confronted Torres, then walked away, and when Torres followed him, appellant expressed his willingness to fight. According to appellant, "I asked him if he wanted to fight. I was willing to fight him if that was what he wanted." Appellant and Ruiz were young men in their early twenties, the victim was fifty-four and inebriated, and at least Ruiz was armed with a knife. Appellant's testimony was that a fight started after Torres tried to hit him, that they "both hit each other," that at one point Torres kicked him—"it wasn't very strong, but he did,"—after which appellant "really hit him," on the eye and in the face, causing Torres to fall down. According to appellant's testimony, it was then that Ruiz stabbed Torres:

Q. What happened after that?

A. Well, he fell after I hit him. It was when I really hit him that he fell. When he fell down I moved back waiting for him to get up to keep on fighting if he wanted to keep on fighting. But then Fransisco Ruiz who was right behind me—well, everything was very fast. He did it very fast. I saw when he put his hand in his pocket to get the blade and went to him, but I didn't see him unfold or anything. I just saw him. It was when he told me, move aside, Chicken, I'm going to teach you how to fight. He went to him and well—I couldn't do anything. I thought—well, I didn't think he was hitting him with a blade, because I didn't see him unfold it or anything. I just saw him pull it out and go to him. I think it was ready then.

At no point did appellant suggest that he was enraged by the ethnic slurs allegedly spoken by Torres. Appellant's testimony was that he responded to the victim's comments by asking him "why he was calling me those things, that I didn't know of any reason why he should be using that language." Nor was there any suggestion that appellant was hurt by or in fear of Torres. What appellant's version of the evidence clearly conveyed was the existence of a gross mismatch, an older inebriated man against two younger men, at least one armed with a knife.

verdict of aggravated or reckless manslaughter and conclude that the trial court was correct in refusing to charge any form of manslaughter.

There is no evidence in the record of "passion" or extreme emotional disturbance. The very slight evidence of appellant's provocation, consisting of the "ethnic slurs" and the victim's attempt to strike appellant, after being spurred on by appellant's invitation to fight, was not acknowledged by *any* witness to have caused appellant to participate in the homicide.[12] Only the State's witness (Santana) linked appellant to the homicide, but at a point after the victim had sustained a beating and a broken ankle. Santana, a disinterested passerby, testified that he first found the victim beaten but conscious, and that he saw the defendants stabbing Torres when he returned after having telephoned the police.

Thus, a jury verdict of passion/provocation manslaughter would have required the jury to disbelieve defendant's testimony that Ruiz killed Torres, accept Santana's testimony that both men killed Torres, and reject Santana's testimony that the homicide occurred after he found the victim beaten but conscious. Passion/provocation manslaughter in this case is not only inconsistent with the defendants' testimony; it is also inconsistent with the State's version of the homicide and is substantiated by *no* testimony in the record. *Cf. State v. Powell, supra,* 84 *N.J.* 305. (Although at trial defendant denied involvement in the crime and claimed an alibi, *id.* at 309, the State introduced a contradictory statement from defendant that

---

[12]Moreover, the brutality of the homicide—Torres murdered with at least eleven stab wounds and his ankle broken so badly that his foot was nearly severed—is inconsistent with the meager evidence of provocation offered by appellant. *Cf. People v. Matthews,* 21 *Ill.App.*3d 249, 253, 314 *N.E.*2d 15, 19 (App.Ct.1974) ("A slight provocation will not be adequate since the provocation must be proportionate to the manner in which the accused retaliated and therefore if accused on a slight provocation attacked deceased with violence out of proportion to the provocation and killed him, the crime is murder. This is especially true if the homicide was committed with a deadly weapon."); *United States ex rel. Peery v. Sielaff,* 615 *F.*2d 402, 405 (7th Cir.1979) (response must be proportional to provocation to justify passion/provocation manslaughter instruction), *cert.* denied, 446 *U.S.* 940, 100 *S.Ct.* 2163, 64 *L.Ed.*2d 794 (1980).

was held to support a manslaughter instruction. *Id.* at 320.) Unlike *Powell,* no evidence in this record connects the alleged provocation to the homicide.

Our disagreement with our dissenting colleagues does not concern the rules that we apply but rather their application to the facts of this case. As does Justice O'Hern, we eschew a formalistic approach in determining whether manslaughter should be charged, but in deciding that issue we are obliged to consider the adequacy of the evidence of provocation and the sufficiency of the evidence linking the provocation to the homicide. We reach our decision today after reviewing all of the circumstances and drawing all inferences that "logic and common sense" will allow. *State v. Powell, supra,* 84 *N.J.* at 314.

We punish less severely those homicides committed "in a transport of passion * * * induced by an adequate provocation" because of a "recognition that the average person can understandably react violently to a sufficient wrong and hence some lesser punishment is appropriate." *State v. Guido, supra,* 40 *N.J.* at 209–10.[13]   On this record, we hold that there was

---

[13]Although the doctrine of manslaughter based upon passion/provocation is sometimes justified on the ground that it demonstrates the absence of criminal intent, a more accurate explanation is that homicides committed because of adequate provocation should be punished less severely than homicides committed in the absence of adequate provocation. The Model Penal Code's explanation is instructive:

The doctrine of provocation began as a logical inference from the early meaning of "malice aforethought." Apparently, this phrase was once construed to require actual premeditation in advance of the homicidal act. It therefore followed that one who killed in a sudden rage or in the "heat of passion" lacked the state of mind required for murder. In time, prior deliberation disappeared from the definition of "malice aforethought," and it became clear that any intent to kill, however suddenly conceived, could support liability for murder. Provocation nevertheless survived as a rule of mitigation for intentional homicides committed in certain extenuating circumstances, and many authorities continued to describe heat of passion as negating "malice aforethought." This may be a convenient way to state the conclusion that provocation reduces murder to manslaughter, but the description is analytically misleading. Intent to kill satisfies "malice

inadequate evidence to provide the jury with a rational basis for convicting appellant of passion/provocation manslaughter.

## IV

Appellant contended for the first time in the Appellate Division that the assistant prosecutor, during summation, improperly attacked the credibility of the defense witnesses by arguing facts not supported by evidence in the record. Alleging plain error, appellant objects to the prosecutor's suggestion during summation that these witnesses departed from their statements to the police and coordinated their trial testimony with the aid of an individual who was seated in the courtroom during the trial. The Appellate Division, concluding that there was evidence in the record to support the prosecutor's insinuation, found no merit in appellant's contention. We agree with the Appellate Division's disposition of this issue.

We do not consider appellant's contentions as to the excessiveness of the sentence since the Appellate Division has vacated the sentence and remanded the matter for resentencing by the trial court.

For the reasons stated, the judgment of the Appellate Division is affirmed.

---

aforethought." A sudden rage, however engendered, does not necessarily or even probably negate an intent to kill. More likely it reinforces the firmness of the actor's resolve to take the life of another. At most, therefore, provocation affects the quality of the actor's state of mind as an indicator of moral blameworthiness. Provocation is thus properly regarded as a recognition by the law that inquiry into the reasons for the actor's formulation of an intent to kill will sometimes reveal factors that should have significance in grading. It is a concession to human weakness and perhaps to non-deterability, a recognition of the fact that one who kills in response to certain provoking events should be regarded as demonstrating a significantly different character deficiency than one who kills in their absence. [MPC § 210.3, at 54–55.]

O'HERN, J., concurring in part, dissenting in part.

I agree with the views stated in Part II of the majority opinion that the jury's verdict of felony murder does not render harmless an erroneous refusal to charge the jury on available manslaughter verdicts. I also agree generally with the principles of law expressed in Part III of the opinion. I disagree that on the facts of this case the manslaughter issue should not have been submitted to the jury.

Although the versions of the incident are in sharp dispute, together they contain the facts that a jury will weigh in drawing the ultimate inferences of whether defendant acted with a state of culpability other than the purpose or knowledge to kill the victim.

When we come to the question of what inferences the jury can draw from the facts presented to it, the distance a court will go is shown fairly well in *State v. Bonano,* 59 *N.J.* 515, 523–24 (1971). There, as this Court stated in *State v. Powell,* 84 *N.J.* 305 (1980),

> this Court, evaluating evidence introduced to support a claim of self-defense, found that a manslaughter charge based on provocation/passion was justified despite the total absence of any suggestion that defendant became angry. All that was before the jury in [*Bonano*] was that defendant might have thought that the victim was trying to harm him, and that some gesture on the part of the victim had been made. Based on that provocation, defendant shot and killed the victim; * * *. [*State v. Powell, supra,* 84 *N.J.* at 319.]

*Powell* follows *Bonano* in supporting the giving of the instruction "[i]n spite of a record barren of evidence of any loss of self-control on the part of the defendant * * *," 84 *N.J.* at 312, and states that "there are no legal rules as to what inferences" a jury can properly draw from the proofs in a given case, *id.* at 314. Thus, the defendant's failure here to assert that he was overcome by a passionate rage is not determinative

of the manslaughter issue because the jury is free to draw the inferences it deems plausible and credible.[1]

If the jury believed certain parts of the defendant's version of events, it could have concluded that the victim, Torres, used racial epithets and coupled them with provocative and persistent acts; Arriagas said he ignored the first insults from Torres and challenged him to a fight only when Torres came at him. It also could have believed that Torres threw the first punch (or kick) and that this angered Arriagas. As noted, the defendant testified that he was "upset." The fact that Arriagas never said that he was so provoked that he lost control and killed Torres does not mean that the jury could not have reached that conclusion on its own once it heard evidence of the victim's alleged assaultive conduct. To condition the defendant's right to a manslaughter instruction based on *what he said at the trial* is contrary to *Powell.* 84 *N.J.* at 317 (a defendant is entitled to the instruction regardless of whether it is consistent with his testimony or theory of defense).

It should be noted that even inadequate provocation coupled with an objectively unreasonable reaction may be relevant to a case, like this one, because the jury may find that it creates a reasonable doubt about the existence of the "malice" (under our new Code, the mental state of knowledge or purpose) required for murder, *id.* at 314–15, thus warranting a possible verdict on a lesser-included offense of murder.

Murder cases will almost always turn on the mental state of the accused. Deciding that question is the jury's function. 2 *Wharton's Criminal Law* § 164, at 259 (C. Torcia 14th ed. 1979) (where there is dispute, jury should decide questions of adequate provocation); *see also* American Law Institute, *Model Penal Code and Commentaries* § 210.3, at 57–61 (perm. ed. 1980) (recognizing limited value of categorical rules on mitiga-

---

[1] In any event, the trial transcripts indicate that Arriagas clearly testified that after the victim cursed and kicked him, "I really got upset and hit him."

tion developed by common law). Even "words alone," when they are racial slurs, may be particularly odious to our societal values and may, in some people, provoke violent reactions. *See, e.g., State v. Sturdivant,* 607 *S.W.*2d 230, 231 (Tenn.1980) (racial slurs could be sufficient provocation to support manslaughter conviction even though they were not sufficiently threatening to support self-defense exoneration).

All that is required is that "the evidence leaves room for dispute" that the killing might have occurred other than as alleged. *State v. Sinclair,* 49 *N.J.* 525, 542 (1967).

Disconcerting as it may be, on the facts of this case, I believe the evidence leaves enough room for dispute that "it would not be *idle," id.* at 540 (emphasis in original), to have had the jury consider manslaughter. There was, clearly, some evidence of provocation. What effect that had on the mental state of the defendant we will never know, for by virtue of its verdict of felony murder, the jury never considered the defendant's mental state vis-a-vis homicide. There was, in addition, the added fact that the defendant and four witnesses testified that Arriagas took no part in the killing. Taken together, the combination of factors makes it conceivable that the jury, if allowed to consider the available homicide verdicts, might have concluded either that Arriagas did not kill Torres, killed him but did not intend to kill him, or intentionally killed him in a rage in the midst of a fight. In hindsight, none is a defense the jury would have been likely to accept. But that is not the test. The test is whether there was room for dispute. On the facts of this case, I would have left that issue to the jury.

*For affirmance—*Justices CLIFFORD, HANDLER, POLLOCK, GARIBALDI and STEIN—5.

*For remand for new trial—*CHIEF JUSTICE WILENTZ and Justice O'HERN—2.