729 A.2d 432

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT, v.
MICHAEL R. KLICH, DEFENDANT–APPELLANT.

Superior Court of New Jersey
Appellate Division

Submitted January 4, 1999—Decided May 6, 1999.

Before Judges PETRELLA, CUFF and COLLESTER.

*Ivelisse Torres*, Public Defender, attorney for appellant (*Marcia Blum*, Assistant Deputy Public Defender, of counsel and on the brief).

*Peter Verniero*, Attorney General, attorney for respondent (*Wendy Alice Way*, Deputy Attorney General, of counsel and on the brief).

Appellant filed a *pro se* supplemental brief.

The opinion of the court was delivered by

COLLESTER, J.A.D.

Tried to a jury, defendant, Michael Klich, was convicted of the crimes of murder, in violation of *N.J.S.A.* 2C:11–3a(1) or (2), possession for an unlawful purpose of a handgun used in the murder, in violation of *N.J.S.A.* 2C:39–4a, and unlawful possession of a handgun without a permit, in violation of *N.J.S.A.* 2C:39–5b. After the sentencing judge merged the weapons counts, the defendant was sentenced to an aggregate term of life imprisonment with a thirty year parole disqualifier in addition to the

mandatory fees and penalties. Defendant appeals, setting forth the following grounds:

*POINT I*—THE INSTRUCTION ON VOLUNTARY INTOXICATION CONTAINED THREE REVERSIBLE ERRORS: (1) IT FAILED TO INFORM THE JURY THAT THE DEFENSE DID NOT APPLY TO THE LESSER OFFENSE OF AGGRAVATED MANSLAUGHTER; (2) IT TOLD THE JURY TO CONSIDER ONLY THE EVIDENCE OF INTOXICATION PRODUCED BY THE DEFENDANT, THUS EXCLUDING FROM THE JURY'S CONSIDERATION THE RELEVANT EVIDENCE PRODUCED BY THE STATE; AND (3) IT FAILED TO INFORM THE JURY THAT THE DEFENSE APPLIED TO THE CHARGE OF POSSESSION OF THE MURDER WEAPON FOR AN UNLAWFUL PURPOSE. (Not Raised Below.)

*POINT II*—DEFENDANT WAS DENIED HIS CONSTITUTIONAL RIGHT TO FORGO COUNSEL AND REPRESENT HIMSELF.

The State's salient proofs were as follows. On September 17, 1994, at approximately 9:30 p.m., defendant entered the Paddock Tavern, a neighborhood tavern located at 1632 Main Avenue in Clifton. He lived in an apartment house at 19 Knickerbocker Avenue located about two blocks away. Defendant told the bartender, Tara Cavanagh, that his name was "Mike" and that he had recently moved to the neighborhood. Cavanagh testified that she served defendant eight to ten glasses of Bud Ice beer and three to four shots of Old Grand Dad bourbon over the course of that evening. Tom Jones, the other bartender and cook, testified that the defendant ate a cheeseburger and french fries and an order of popcorn shrimp.

Shortly before 1 a.m. the victim, Arthur Polzer, entered the tavern. Polzer had worked at the Paddock and was friendly with Cavanagh and Jones. He was a stranger to defendant. Polzer's clothes and hair were wet, and he announced to Cavanagh and Jones that it was "fucking raining out." Defendant then turned to Polzer and asked if it was raining outside. Polzer responded, "I just said it's raining out there. Do you want to feel me, I'm soaking wet." Apparently taking the victim's comment as a sexual reference, defendant replied, "No, I'm not going into doing charity work. I just wanted a yes or no answer." When defendant and the victim continued to argue, Jones, the bartender, told the two of them, "Shut up, drink your drink and stop arguing."

Polzer walked to the cigarette machine at the back of the tavern. As he passed defendant, the two men exchanged some more words, and Polzer said, "Leave me alone, just leave me alone." The defendant returned to the bar and drank his last glass of bourbon. Cavanagh noticed that his hand was shaking when he reached for the drink.

Defendant left a $4 tip on the bar and walked to the door. As he passed Polzer he said, "Fuck you" or "You're a fucking asshole." Defendant went out the door, and Polzer followed right after him. Seconds later Jones and Cavanagh heard a gunshot. Jones jumped over the bar and raced outside to see Polzer lying on his back in front of the door.

Seeing that Polzer had been shot in the face, Jones told Cavanagh to call the police. He then started to follow defendant who was walking about thirty feet ahead, but stopped when Cavanagh screamed for him to return to the tavern. When the police arrived moments later, Jones met the patrol car in the street and pointed in the direction that the shooter was heading.

Todd Calderon lived across the street from the tavern. Hearing the gun blast, he looked out his window and saw Jones standing in front of the tavern. The victim was lying on the sidewalk, and another man was walking away. Calderon told his wife to call the police. He got dressed, got into his car, but could not find the man he saw leaving the scene.

Keith Grinkin, another witness, was getting gas for his friend's car at a nearby Mobil station when he heard the gunshot and dove to the ground. He looked in the direction of the shot and saw a man standing over another man who was lying on the ground. He watched as the man standing put an object under his sweater into his waistband and walked away. When a police car passed him, the man began to run, and he cut through the parking lot of a nearby bank.

Polzer was pronounced dead, the cause of death being a single gunshot to the right side of his face which lacerated the carotid

artery in his neck and lodged behind his left ear. The pathologist estimated that the bullet was fired from close range of eight to eighteen inches and caused death within minutes by internal bleeding. Toxicological examinations disclosed that Polzer had a blood level alcohol of .30.

The following day a composite sketch of the suspect was completed with the aid of Cavanagh and Jones. In the meantime, the Clifton police canvassed the neighborhood with a physical description of the suspect. When they interviewed Salvatore Giordano, the owner of a liquor store located near the Paddock Tavern, one of the officers mentioned that the suspect drank shots of Old Grand Dad bourbon at the tavern. Giordano told the police that he recently ordered three bottles of 100 proof Old Grand Dad bourbon for a customer who lived in the neighborhood. When the detectives later showed Giordano the composite sketch, he said that it depicted that customer.

Two neighbors of the defendant were shown the composite picture and directed police to 19 Knickerbocker Avenue. When the defendant answered the door, the officers saw that he resembled the composite. The officers told him that they were investigating a disturbance the night before and asked defendant his name and whether he was at home the previous night. Defendant gave his name, said that he had recently moved into the neighborhood and that he was at the Paddock Tavern the night before. As they were talking, Officer Ralph Pennella noticed the defendant's hand slide toward the small of his back. Concerned for his safety, Pennella grabbed the defendant to pat him down and found a hunting knife in the defendant's left rear pocket. He arrested defendant, gave him his *Miranda* [1] warnings and took him to the Clifton police station to be photographed.

Later that afternoon Jones and Cavanagh separately selected defendant's photograph from an array shown to them. Defendant was charged with the murder and re-administered his *Miranda*

---

[1] *Miranda v. Arizona*, 384 *U.S.* 436, 86 *S.Ct.* 1602, 16 *L.Ed.*2d 694 (1966).

warnings. In response to questioning by the police, he admitted being at the Paddock Tavern the night before and arguing with a man about the weather. He denied shooting anyone. He bristled at the suggestion that he may have been intoxicated and forgotten what had occurred. Meanwhile, other officers questioned defendant's mother who said that defendant had arrived home the night before at about 1:30 a.m. A search warrant was obtained and executed. The officers found an empty shell casing on a tray on top of the defendant's bedroom dresser and a .38 Special Smith and Wesson in a holster in the top drawer of the night stand next to defendant's bed. Two other handguns and a holster were in a shoe box in the defendant's bedroom closet. Two full bottles of 100 proof Old Grand Dad bourbon were also found in a gun cabinet in defendant's bedroom, and an empty bottle was on the floor of the kitchen. A can of Bud Ice beer was on the top shelf of defendant's bedroom closet, and three full cans of Bud Ice beer were in the refrigerator.

State police ballistics expert Stephen Deady testified that the discharged metal shell casing found on defendant's dresser matched the bullet recovered from the victim's head and was fired by the .38 Smith and Wesson found in defendant's night stand. The weapon was not registered to defendant.

Testifying on his own behalf, the defendant admitted that he was in the Paddock Tavern on the night of the murder. He said that he drank four glasses of beer and three shots of Old Grand Dad bourbon over the course of the evening. He denied that he was intoxicated. When he admitted having harsh words with someone at the bar, he claimed that he left the bar without further incident at 11:45 p.m. and walked home to watch television with his mother. He contended that he was the victim of mistaken identity. He denied any knowledge of the murder weapon and shell casing and was unable to explain their presence in his bedroom other than to suggest that they were planted by the police.

The defense also put forth the defense of intoxication, contending that despite his denials, defendant was intoxicated to the extent that he could not act "purposely" or "knowingly" within the meaning of *N.J.S.A.* 2C:11–3(a). *See State v. Cameron,* 104 *N.J.* 42, 59, 514 *A.*2d 1302 (1986).

Dr. Frederick Rotgers, a clinical pathologist and research professor at the Center of Alcohol Studies at Rutgers University, testified that he reviewed the various reports and statements of witnesses in addition to interviewing defendant. Defendant told Dr. Rotgers that he drank a total of four beers and four shots of bourbon on the evening of the murder, but Dr. Rotgers testified that he placed more credence in the testimony of Tara Cavanagh as to the alcohol consumed by defendant that night. In any event, he testified that on either version he estimated that defendant's blood alcohol level exceeded the legal limit for driving while intoxicated at the time he left the bar. Accepting Cavanagh's recollection, Rotgers estimated a blood alcohol level of .236 to .264. The defendant's account led to Rotgers' opinion of a blood alcohol level of .121.

Rotgers further testified that the degree of defendant's intoxication could not be gauged on the basis of behavior such as slurred speech or an unsteady gait because a behavioral tolerance enables many intoxicated persons not to display such signs. His opinion was that the defendant at the time of the crime had "alcohol myopia," impairing his ability to process relevant information in the manner that was "purposeful" or "knowing."

No specific charge was requested by defendant, and no objections were made to the charge. After instructing the jury as to the elements of murder including the requisite mental states of "purposeful" and "knowing," the trial judge gave the following Model Charge on intoxication:

Now, there's evidence in this case concerning the use by the defendant of alcohol prior to and at the time in question.

Generally, a defendant is not relieved of criminal responsibility because he is found to have acted under the influence of an intoxicating beverage. The general

assumption is that the person is normal and is possessed of ordinary faculties. The State need not prove that the defendant was sober.

You may consider the evidence as to the defendant's consumption of alcoholic beverages in determining whether he was intoxicated to such a degree that he was incapable of acting purposefully or knowingly. Therefore, once defendant produces some evidence of his intoxication, the State must prove beyond a reasonable doubt that such intoxication did not render defendant incapable of acting purposefully or knowingly.

Intoxication under our law means a disturbance of mental or physical capacities resulting from the introduction of substances into the body.

In considering the question of intoxication, you should carefully distinguish between the condition of mind which is merely excited by intoxicating drink and yet capable of acting with purpose or knowledge and the condition in which one's mental faculties are so prostrated as to deprive one of his will to act and his ability to reason thereby rendering a person incapable of acting and thus preventing the person from committing the crime charged with the mental state required of either purposefully or knowingly.

This distinction is important because as explained whether or not the defense of intoxication applies is a factual determination to be made by you.

You may also consider along with the other evidence the degree of intoxication in determining whether or not the defendant was capable of acting with purpose or knowledge to commit the crime charged of murder.

You will recall that I explained to you the elements of murder. One of those elements was that the defendant had to act with purpose or knowledge, which I also explained to you.

If after considering all the evidence you have a reasonable doubt whether the defendant's intoxication was such as to render him incapable of acting purposely or knowingly, then, you must acquit him of murder and go on to consider whether he should be convicted of the crime of aggravated manslaughter.

If, however, the State has proved to you beyond a reasonable that the defense does not apply, that the State has proved all the elements of the murder previously defined for you beyond a reasonable doubt, then, you must find the defendant guilty of murder.

The trial judge then instructed the Model Charge on the lesser included offense of aggravated manslaughter, which included the mental state of "recklessness," without making any reference to the effect of intoxication. The judge stated:

A person who causes another's death does so recklessly when he is aware of and consciously disregards substantial and unjustifiable risk that death will result from his conduct. The risk must be of such a nature and degree that considering the nature and purpose of the defendant's conduct and the circumstances known to defendant its disregard of that risk is a gross deviation from the standard of conduct that a reasonable person would follow in the same situation. In other

words, you must find that the defendant was aware of and consciously disregarded the risk of causing death.

If you find the defendant was aware of and disregarded the risk of causing death, you must determine whether the risk he disregarded was substantial and unjustifiable. In doing so, you must consider the nature and purpose of the defendant's conduct and the circumstances known to defendant and you must determine whether in light of those factors the defendant's disregard of that risk was a gross deviation from the conduct a reasonable person would have observed in defendant's situation.

■ Defendant argues that the trial judge's charge was reversible plain error since the jury was not instructed that intoxication is not a defense to aggravated manslaughter as required by the holding of *State v. Warren*, 104 *N.J.* 571, 577, 518 *A.*2d 218 (1986). While the proof of defendant's guilt can fairly be described as overwhelming, we are constrained to reverse.

Similar to the present case, the defense in *Warren* was that defendant was so intoxicated at the time of the offense that he was incapable of acting "purposefully" or "knowingly." Defendant did not testify, but others described his alcoholism and his drunkenness on the day of the homicide. The trial judge explained the elements of murder with particular reference to the mental states of "purposefully" or "knowingly" and charged the Model Jury charge on intoxication. When instructing on the lesser included charges of manslaughter, the judge did not explain that intoxication was not a defense to aggravated manslaughter or manslaughter. Although no objection was taken to the charge, the Supreme Court reversed on plain error.

This case echos *Warren* since the lesser included charge of manslaughter was defined without relation to intoxication. In *Warren* the Supreme Court stated:

Although the court related the effect of intoxication to the unlawful possession of a weapon, an offense that requires knowledge, it did not charge that intoxication was not a defense to aggravated manslaughter or manslaughter. The court should have told the jury that even if it found defendant's intoxication rendered him incapable of acting knowingly or purposely, it could still find that he consciously disregarded "substantial and unjustifiable risk," *N.J.S.A.* 2C:2–2b(3) (manslaughter), or that he caused the victim's death "under circumstances manifesting extreme indifference to human life," *N.J.S.A.* 2C:11–4a (aggravated manslaughter). Furthermore, the court should have instructed the jury not to consider defendant's

intoxication in determining whether he consciously disregarded the risk of the victim, but to view defendant's conduct objectively, as if he were sober, in determining whether he consciously disregarded that risk. By failing to instruct the jury that it could accept defendant's intoxication as a defense to murder and still convict him of manslaughter, the court permitted the jury to believe that defendant's intoxication prevented a conviction for manslaughter. In effect, the court unintentionally prevented defendant's conviction on the lesser included offenses of aggravated manslaughter or manslaughter, and forced the jury to choose between a murder conviction and an acquittal.

[*Warren, supra*, 104 *N.J.* at 578, 518 *A.*2d 218.]

In *State v. Bey*, 112 *N.J.* 123, 144–45, 548 *A.*2d 887 (1988), a murder conviction on appeal when *Warren* was decided, the Supreme Court distinguished *Warren* because unlike the instant case the trial court charged the jury that intoxication was not a defense to aggravated manslaughter and thereby had no bearing on the defendant's guilt or innocence on that charge.

Although the charge might have been more explicit, the trial court stated with reference to intoxication, "[b]ut the influence of liquor and/or drugs no matter how persuasive ... is not a defense to the crime of aggravated manslaughter and, therefore, has no bearing on the guilt or innocence of the defendant for that crime." Thus the trial court made clear that even if defendant's claimed intoxication negated knowing or purposeful murder, it had "no bearing" on defendant's culpability for aggravated manslaughter. Although the trial court did not specifically mention manslaughter, we cannot say that the charge constituted plain error. *State v. Macon*, 57 *N.J.* 325, 273 *A.*2d 1 (1971); *R.* 2:10–2.

[*Bey, supra*, 112 *N.J.* at 145, 548 *A.*2d 887.]

While not citing *Warren* or *Bey*, the State contends when consideration is given to the charge as a whole, there was no reversible error. Specifically, the State asserts that the trial judge charged intoxication relating to the "purposeful" or "knowing" elements of murder and then told the jury that if the elements were not proved beyond a reasonable doubt to consider aggravated manslaughter and "recklessness" and did not charge intoxication, thereby implying that intoxication was not a viable defense to aggravating manslaughter. The argument flies in the face of the clear mandate of *Warren* that the jury must be specifically advised that intoxication is not a defense to manslaughter or aggravated manslaughter and that failure to instruct is plain error mandating reversal. *Warren, supra*, 104 *N.J.* at 579, 518 *A.*2d 218.

 We also cannot accept the argument that the omission in the charge was harmless error in light of the strong proof of defendant's guilt for murder. Incorrect jury instructions are poor candidates for rehabilitation under the harmless error doctrine. *State v. Bowens*, 108 *N.J.* 622, 640, 532 *A.*2d 215 (1987); *State v. Crisantos*, 102 *N.J.* 265, 273, 508 *A.*2d 167 (1986); *Warren, supra*, 104 *N.J.* at 579, 518 *A.*2d 218. On the contrary, erroneous instructions on matters material to jury deliberation are presumed to be reversible error in criminal cases. *Warren, supra*, 104 *N.J.* at 579, 518 *A.*2d 218; *State v. Green*, 312 *N.J.Super.* 456, 461, 712 *A.*2d 224 (App.Div.), *certif. denied*, 156 *N.J.* 425, 719 *A.*2d 1023 (1998); *State v. Crumb*, 307 *N.J.Super.* 204, 248, 704 *A.*2d 952 (App.Div.1997), *certif. denied*, 153 *N.J.* 215, 708 *A.*2d 66 (1998). Furthermore, while the State now argues that the intoxication defense was not raised by the proofs in this case, the testimony of Dr. Rotgers was received without objection, the issue was argued in summation by both sides and the jury was instructed as to the applicability of intoxication to knowing or purposeful murder. Reversible error results from the lack of a fulsome charge under *Warren.*

 We also reverse defendant's conviction for possession of a weapon for unlawful purposes on the ground that the instruction to the jury on this count of the indictment did not relate the defense of intoxication to the element of purposeful action. *Warren, supra*, 104 *N.J.* at 578, 518 *A.*2d 218.

The remaining contentions in defendant's brief and his *pro se* supplemental brief are without merit and do not warrant discussion in a written opinion. *R.* 2:11–3(e)(2).

Reversed.