**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4978-17

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

CHRISTOPHER APARICIO-REYES,

    Defendant-Appellant.

_____

Argued September 16, 2020 – Decided August 11, 2021

Before Judges Fuentes, Whipple and Rose.

On appeal from the Superior Court of New Jersey, Law Division, Monmouth County, Indictment No. 16-11-1874.

Stephanie Lopez, Designated Counsel, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Stephanie Lopez, on the briefs).

Mary R. Juliano, Assistant Prosecutor, argued the cause for respondent (Christopher J. Gramiccioni, Monmouth County Prosecutor, attorney; Mary R. Juliano, of counsel and on the brief).

PER CURIAM

Defendant Christopher Aparicio-Reyes was tried before a Monmouth County jury and convicted of murdering a woman by strangulation. Defendant told the law enforcement agents who arrested him the day after the murder that the victim, whom he did not know, came into his bedroom as he was snorting lines of cocaine. She took a fifty-dollar bag of cocaine he had just purchased and fifty dollars in cash and refused to return them. In response, he assaulted her by punching her several times in the face. The victim screamed and fell to the ground bleeding. Defendant admitted to law enforcement agents that he strangled the victim to silence her screams.

The trial judge sentenced defendant to life imprisonment with an eighty-five percent period of parole ineligibility, and five years of parole supervision, as mandated by the No Early Release Act, N.J.S.A. 2C:43-7.2(a). "Solely for the purpose of calculating the minimum term of parole ineligibility . . . a sentence of life imprisonment shall be deemed to be 75 years." N.J.S.A. 2C:43-7.2(b). Thus, defendant must serve 64.75 years before he is eligible for parole. Defendant was twenty-one years old at the time he committed this crime and did not have any prior involvement with the criminal justice system or history of juvenile delinquency as a minor.

2

Defendant raises a number of arguments on appeal. In our view, the dispositive substantive argument at issue here concerns the trial judge's instructions to the jury regarding defendant's state of mind at the time he committed this homicide. Relying on our Supreme Court's holding in State v. Warren, 104 N.J. 571, 579-80 (1986), defendant argues the trial judge committed reversible error by not instructing the jury that defendant's self-induced intoxication defense did not apply to the lesser included offenses of aggravated manslaughter and manslaughter.

The State urges us to reject defendant's argument based on the following three independent grounds: (1) the self-induced intoxication charge the trial judge gave to the jury was not inconsistent with the Supreme Court's holding in Warren or our decision in State v. Klich, 321 N.J. Super. 388, 396 (App. Div. 2005); (2) there was no legal or factual basis to charge the jury to consider the self-induced intoxication defense because the evidence presented at trial shows defendant was not "intoxicated" as a matter of law at the time he strangled the victim; and (3) defendant is barred under the invited error doctrine from challenging the language in the self-induced intoxication instructions the judge gave to the jury because defense counsel drafted and proposed the charge.

After reviewing the record developed before the trial court and mindful of the prevailing legal principles relevant to the arguments raised by defendant in this appeal, we reverse and remand this case for a new trial. The self-induced intoxication defense charge here contains the same defect that compelled reversal in Warren and Klich. Despite the overwhelming evidence that rationally supports the jury's verdict, we discern no legal pathway to affirm. We derive the following facts from the testimony of the witnesses who testified at trial and from defendant's account of the events that led him to kill the victim, as he described them to the detectives who interrogated him.

I.

On December 13, 2015, defendant resided in a two-story house located on Rockwell Avenue in the City of Long Branch owned by his uncle Octavio Aparacio-Carrasco. Defendant occupied one of the four bedrooms located on the second floor. Aparacio-Carrasco rented out two of the rooms to defendant's friends Candelario Lemus-Vasquez, (a/k/a, Juan Carlos) and Francisco Javier Cruz Nolasco.[1] Aparacio-Carrasco's mother, who is also defendant's

---

[1] We will refer to these two men by their first names in the interest of clarity. We will refer to Lemus-Vasquez by his alias "Juan Carlos." No disrespect is intended.

grandmother, occupied the fourth bedroom.[2]  All of the second floor residents shared the bathroom located on that floor.  Defendant's uncle resided on the first floor of the house with his wife and infant child.

At around three to four o'clock in the afternoon on December 13, 2015, Francisco testified that he returned home from work to get ready for a holiday party and found defendant and Juan Carlos were "drinking and using cocaine" in Juan Carlos's room.  When asked whether he also drank and did drugs with them, he responded: "Yes, a little."[3]  Francisco testified that he did not know what occurred later on that day because he left to take a shower and get ready for the holiday party.  Juan Carlos and defendant declined his offer to go to the party with him.

Juan Carlos testified that he, defendant and Francisco were drinking that afternoon.  When asked if they also were "doing any drugs," Juan Carlos testified that defendant and Francisco were smoking marijuana and snorting cocaine; he claimed he only snorted cocaine.  When they ran out of cocaine, defendant called someone on the phone and arranged to buy fifty dollars' worth of cocaine.

_____

[2]  Defendant's grandmother was hospitalized at the time this homicide occurred. She died sometime thereafter.

[3] Francisco and "Juan Carlos" testified with the assistance of court-certified Spanish-Language interpreters.

A-4978-17

Defendant then asked Juan Carlos to pick it up. The prosecutor followed up on this point with the following line of questions:

> Q. Why did he ask you to pick up the coke?
>
> A. He told me that he owed money to the guy and that's why he wasn't going.
>
> Q. And now did that mean that he would – that the person would not give the drugs to him because he already owed him money?
>
> A. He owed him money, yes.
>
> Q. Did you actually go and meet this person?
>
> A. Yes, I went to pick that up.
>
> Q. All right. How much money did the cocaine cost?
>
> A. 50 [dollars].
>
> Q. Where did the $50 come from?
>
> A. [Defendant] gave that to me.

Juan Carlos testified that he first noticed the woman, who was later identified as Jennifer Pizzuto, immediately after he bought the fifty-dollar bag of cocaine. According to Juan Carlos, Pizzuto followed him until he reached the entrance door of the house. As he was about to enter, Pizzuto asked Juan Carlos if he could "give her some water." From this point forward, Juan Carlos's testimony is materially inconsistent with certain important parts of defendant's

6

account of his interactions with Pizzuto. The best way to illustrate these inconsistencies is to recite Juan Carlos's testimony verbatim:

Q. So as you were going back into the house, a woman asked you for water, is that correct?

A. Yeah, she asked me if I could give her water and I said yes.

Q. And then what happened?

A. Then I told her to wait there, that I was going to go and get that because I didn't have water.

Q. Now, are you still –

A. Downstairs.

Q. Were you speaking to her in English or Spanish?

A. In Spanish, in Spanish.

Q. Did she speak Spanish?

A. Yes.

Q. All right. She was able to communicate with you?

A. Yes.

[(Emphasis added)]

Juan Carlos left the entrance door ajar and walked upstairs to get her water; Pizzuto followed him inside and told him she needed to use the bathroom. Juan Carlos told her that she could not use the bathroom "because [Aparacio-

7

Carrasco] will call our attention if we did bring unknown persons." At this point, defendant came out from inside his room and told Juan Carlos "give it to me, I will speak with her." Juan Carlos testified that

> from that moment I went to my room, I gave him what I had with me and then I went to my room and they went inside.
>
> Q. When you say you gave him what you had, do you mean the cocaine?
>
> A. Yes, yes.
> . . . .
>
> Q. Did you see her go into [defendant's] room?
>
> A. Yes.
>
> Q. Did [defendant] leave the door open or did he close it?
>
> A. He closed it.

Approximately fifteen to twenty minutes later, Juan Carlos left his room to go to the bathroom and

> saw [defendant] at the door. I saw him nervous and with blood on his hands. And then I said what happened to you, brother. He didn't answer and then he closed the door and then I went back to my room. And then I went downstairs and I told Octavio [defendant's uncle] . . . you should go and see [defendant] because I think he got caught by some blood on his hands.

A-4978-17

Defendant's uncle testified as a witness for the State. He described what transpired when he went to defendant's room in response to Juan Carlos's request. Aparicio-Carrasco knocked on defendant's bedroom door; defendant yelled out: "hold on, hold on . . . [and] didn't open the door." When defendant finally responded, he only opened the door "like a few inches and then he was putting his hands on the wall and then the other one was holding [the] door." Aparicio-Carrasco testified this prevented him from seeing defendant's hands. He asked defendant to show him his hands, but he did not do so "at the beginning." When defendant eventually capitulated, Aparicio-Carrasco saw only "some blood on his hands."

Defendant told his uncle that "he got into a fight with a guy." Aparicio-Carrasco told his nephew to wash his hands and returned to his residence on the ground floor. Sometime thereafter, he heard defendant going up and down the stairs for approximately ten minutes. When Aparicio-Carrasco returned to defendant's room, he only saw a bloody white shirt on the floor. However, he noticed that defendant continue to be "very nervous." Aparicio-Carrasco also looked inside his mother's bedroom.

Although he did not find anything suspicious in this initial search of the second-floor rooms, Aparicio-Carrasco remained convinced that something was

9

amiss. His suspicions were piqued when he found the door to Francisco's bedroom locked. He called Francisco and confirmed that he had not locked the door to his room, and asked him to return to the house so he could open the door of his room. Defendant left the residence before Francisco arrived. When Aparicio-Carrasco opened the door to Francisco's room, he found Pizzuto's body face down on the floor. He closed the door and called the police.

Long Branch Police Officers, First Aid, paramedics, and crime scene detectives from the Monmouth County Prosecutor's Office responded to Aparicio-Carrasco's home. The paramedics confirmed that Pizzuto's body was cold and without a pulse. She had a visible head wound and multiple lacerations on her face and around the area of her mouth. The police officers found a tooth underneath her body, a second tooth in the hallway, a partial tooth in the closet, and a "clump of hair" and bloody rags on the floor of a bedroom across the hall. There was a visible "streak of blood" that extended from Pizzuto's body to the pile of rags. The officers also found bloody tissues and a blood-stained towel in the bathroom.

After a fast-paced yet extensive investigation, officers from the Long Branch Police Department arrested defendant the following morning. Defendant

waived his constitutional rights under <u>Miranda</u>[4] and agreed to answer Detective

Michael Verdadeiro's questions and describe what occurred inside his bedroom

that led to Jennifer Pizzuto's death.

Defendant's answers corroborated, in part, some of the details provided by

Francisco and Juan Carlos. He confirmed that the three of them were drinking

beer and using drugs in Juan Carlos's room. When they ran out of cocaine, he

gave Juan Carlos fifty dollars and asked him to buy a bag of cocaine. He did

not go himself because he "was having issues" with his dealer. He became

anxious when Juan Carlos did not rush back with the fifty-dollar bag of cocaine

and "went outside to check if . . . he was coming." Juan Carlos eventually came

back "with a woman" defendant did not know.

At this point, defendant told Detective Verdadeiro:

> I don't know how she . . . went up to my room; she went
> upstairs. [Juan Carlos] brought her upstairs. And I
> said, "So now what? What happened?" And I . . . And
> since that guy was kinda drunk; all drunk
>
> . . . .

<hr>

[4] After conducting a N.J.R.E. 104(c) hearing on May 9, 2017, the Criminal Part denied defendant's motion to suppress incriminating statements he made in the course of an interrogation conducted by detectives from the Long Branch Police Department and Monmouth County Prosecutor's Office. The motion judge found defendant knowingly and freely waived his rights under <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966). Defendant does not challenge the Criminal Part's determination in this appeal.

Q. He was drunk?

A. Uhum. Me too. He was too. We all were.

Q. And all, all drunk.

A. We were all like that; we were.

Defendant insisted that he did not know the woman, had never seen her before that day, and did not even know her name. He also alleged that he was unable to communicate with her because she spoke only in English and he speaks only Spanish. He believed she was under the influence of crack because she showed him a crack pipe. Defendant also claimed that "she saw [he] had the drugs. And my money was in my room. She wanted to take advantage; she took it away from me and I told her, I told her. 'Calm down. Give me my money back.'" He claimed she stole fifty dollars in cash. Notwithstanding his alleged inability to communicate with her, defendant claimed he told her: "You have a big problem."

Defendant made clear that he remembered every detail of what he did to the victim the previous day. He told Detective Verdadeiro: "The woman robbed me" and "since I was so high and all that, I freaked out." As the following colloquy reveals, defendant knew the difference between an alcohol induced

12

memory gap and an out-of-control violent rage, possibly fueled by snorting

cocaine:

> [I]t came out of me, it came out of me. Because sometimes that happens to me when I am drunk and all that . . .
>
> Q. Uhum.
>
> A. <u>I already got in trouble here with, with the police before; also because I got drunk once</u>.
>
> . . . .
>
> There is a small bend. I was drinking there with some friends; <u>but I was really drunk. I woke up here and I couldn't remember what I did. They told me I hit some cops; I spat on them and all that</u>.
>
> Q. <u>And, and do you remember what happened in your room? Do you remember</u>?
>
> A. <u>Yes, yes, yes. I remember because I told her . . . Yes</u>.
>
> Q. <u>And you might have been a little drunk</u> . . .
>
> A. <u>Yes</u>.
>
> Q. A little high. But you, you . . .
>
> . . . .
>
> <u>You remember everything</u>.

A. <u>That's why I'm telling you, I do remember. What</u> <u>happened is that when I, I freaked out and everything</u> <u>happened</u> . . .

Q. Uhum. So what happened, you . . . when that happened? What, what? How?

A. Because she wanted to . . . she started making a racket. She was screaming.

. . . .

[S]he was screaming. I told her, "Shut up!" My uncle was downstairs.

My uncle Octavio was downstairs with his daughter. He was downstairs.

Q. Do you think he heard anything?

A. [I] [d]idn't want him to hear.

. . . .

How could she take it from me if we didn't, didn't, we didn't do anything at all?

Q. Ok. And what happened?

A. So I, I freaked out and started hitting her.

Q. With what?

A. Just with this.

. . . .

Only with the hand.

Q. You hit her . . . where?

A. I choked her, I believe . . .

. . . .

I choked her, I . . . I squeezed her neck. . . . I am telling
you, I was hitting her and she was on the floor like this
. . . what I did, I grabbed her like this. . . . <u>But because
I was nervous, I squeezed her too much</u> . . .

[(Emphasis added)]

The Medical Examiner who performed the autopsy on the victim testified

that defendant struck her in the face with such force that it knocked out two of

her front teeth, fractured a third front tooth, and caused multiple lacerations to

her face. She also had internal injuries that caused hemorrhages on both her

head and neck. The Medical Examiner testified that the victim died by

asphyxiation and described it as

an alteration of the blood flow up into the brain, as well
as the blood drainage from the brain. This causes a low
oxygen state in the brain. Your brain is very sensitive
to being deprived of oxygen. You will lose
consciousness relatively quickly. I can't put an exact
number on it. It could be 15, 20, 30 seconds. It could
be 45 seconds. But it's on the order of seconds to maybe
a minute or so.

If you release pressure, at that point blood will begin
flowing back to your brain. You should wake back up
again. It's only if the pressure is sustained past the point

15

of the brain being irreversibly deprived of oxygen that you will no longer regain consciousness.

. . . .

Q. And if hypothetically speaking . . . someone were to strangle someone else to stop them from screaming, at what point would they lose the ability to scream?

A. As soon as they were unconscious.

At the end of the State's case, defendant exercised his constitutional right not to testify at trial; defense counsel did not call any witnesses on his behalf. Although defendant was indicted on a single count of murder, by purposely or knowingly causing the death of Jennifer Pizzuto, the verdict sheet provided the jury with the option to find defendant guilty of one of two lesser included offenses: aggravated manslaughter[5] or second degree manslaughter. The jury deliberated for approximately ninety minutes before finding defendant guilty of murder.

---

[5] Although aggravated manslaughter is a first degree offense, it does not fall within the purview of an ordinary term of imprisonment for a first degree offense of ten to twenty years under N.J.S.A. 2C:43-6(a)(1). A person convicted of aggravated manslaughter can be sentenced to a term of ten to thirty years imprisonment. N.J.S.A. 2C:11-4(c).

Against this record, defendant raises the following arguments on appeal.

POINT I

THE MURDER CONVICTION MUST BE VACATED BECAUSE THE TRIAL COURT'S INSTRUCTIONS USURPED THE JURY'S FUNCTION THEREBY DEPRIVING DEFENDANT OF A FAIR TRIAL AND DUE PROCESS.

A. THE TRIAL COURT'S FAILURE TO INSTRUCT THE JURY THE MODEL JURY CHARGE ON THE EFFECT OF INTOXICATION ON THE LESSER-INCLUDED OFFENSES CONSTITUTED REVERSIBLE ERROR. (Not Raised Below)

B. THE TRIAL COURT ERRED IN INSTRUCTING THE JURY THAT THE STRANGULATION IN ITSELF PERMITTED AN INFERENCE ON DEFENDANT'S INTENT TO KILL.

POINT II

THE ADMISSION OF BLOOD SP[L]ATTER TESTIMONY AND GRUESOME CRIME SCENE AND AUTOPSY PHOTOGRAPHS WAS NEEDLESSLY CUMULATIVE, HIGHLY PREJUDICIAL, AND OVERWHELMINGLY INFLAMMATORY AND SERVED ONLY TO INCREASE THE LIKELIHOOD OF A MURDER CONVICTION AND DEPRIVED DEFENDANT OF A FAIR TRIAL. (Not Raised Below)

<u>POINT III</u>

THE TRIAL COURT ERRED IN DENYING DEFENDANT'S MOTION FOR JUDGMENT OF ACQUITTAL.

<u>POINT IV</u>

THE CUMULATIVE EFFECT OF THE ERRORS AT DEFENDANT'S TRIAL DEPRIVED HIM OF THE RIGHT OF DUE PROCESS AND A FAIR TRIAL. (Not Raised Below)

<u>POINT V</u>

THE TRIAL COURT'S IMPOSITION OF A LIFE TERM UPON A TWENTY-THREE YEAR OLD FIRST TIME OFFENDER WAS EXCESSIVE.

We start our analysis by acknowledging the obvious; defendant does not dispute that he killed Jennifer Pizzuto. Indeed, defense counsel made this clear in his opening statement to the jury:

> [M]any of the essential facts are not in issue. You see some cases are about who did it and trying to find that person, and some cases are about trying to find out to what extent a person was injured, to what extent the person was harmed or what the value of something that was taken was.
>
> This is not that case. <u>Because we know that [defendant] caused the death of Jennifer Pizzuto. We know that. We know where it happened. We know how it happened and under what circumstances it happened</u>.
>
> [(Emphasis added)]

Thus, as framed by defense counsel, the only factual issue the jury was asked to decide was whether the record developed at trial supported the application of the self-induced intoxication defense to negate the element of "purposeful or knowing conduct" required to convict defendant of murder. The record of the charge conference conducted pursuant to <u>Rule</u> 1:8-7(b) shows the trial judge discussed the intoxication defense charge, as described in the model charge, and all parties agreed to instruct the jury on this issue with the charge provided by defense counsel without any modification. The following colloquy between the trial judge and counsel confirms this agreement.

> PROSECUTOR: The defense has proposed an intoxication instruction, which the State is not objecting to, which goes to the defense's arguments regarding what the defendant's intent was.
>
> . . . .
>
> THE COURT: In this definition, and we do include three types of homicides, we have got murder, aggravated, and reckless manslaughter. I have added "intoxication" before the latter two, before the aggravated and the reckless.
>
> [Defense counsel], you have had an opportunity to review that language?
>
> DEFENSE COUNSEL: I have, your Honor.
>
> THE COURT: And the State at this point you concede that's an element in this case?

PROSECUTOR: We have no objection to it being included, your Honor.

As proposed by defense counsel, the judge gave the jury the following instructions that explained how to consider the defense of self-induced intoxication:

> As part of the defense to the charge of murder the defendant contends that the State has not proven each element of the offense beyond a reasonable doubt because there is evidence in this case, concerning the use by the defendant of drugs and alcohol on December 13, 2015.
>
> Generally, a defendant is not relieved of criminal responsibility because he is found to have acted under the influence of an intoxicating beverage or drugs. The general assumption is that every person is normal and is possessed of ordinary faculties. The State need not prove that the defendant was sober.
>
> You may consider the evidence as to the defendant's consumption of alcoholic beverages or drugs in determining whether he was intoxicated to such a degree that he was incapable of acting purposely or knowingly. Therefore, once there is some evidence of defendant's intoxication, the State must prove beyond a reasonable doubt that such intoxication did not render defendant incapable of acting purposely or knowingly.
>
> Intoxication under our law means a disturbance of mental or physical capacities resulting from the introduction of substances into the body.
>
> In considering the question of intoxication, you should carefully distinguish between the condition of mind,

which is merely excited by intoxicating beverage or drugs, and yet capable of acting with purpose or knowledge, and the condition in which one's mental faculties are so prostrated as to deprive one of his will to act and ability to reason, thereby, rendering a person incapable of acting and thus preventing the person from committing the crime charged with the mental state required of either purposely or knowingly.

This distinction is important because as explained, whether or not the defense of intoxication applies is a factual determination to be made by you.

You may consider, along with all the other evidence, the degree of intoxication in determining whether or not the defendant was capable of acting with purpose or knowledge to commit the crime charged.

You will recall that I explained to you the elements of murder, one of those elements was that the defendant had to act with purpose or knowledge. A person acts purposely when it is the person's conscious object to cause death or serious bodily injury resulting in death. A person acts knowingly when the person is aware that it is practically certain that his conduct will cause death or serious bodily injury resulting in death.

All jurors do not have to agree unanimously concerning which form of murder is present, so long as all believe that it was one form of murder or the other. However, for a defendant to be guilty of murder, all jurors must agree that the defendant either knowingly or purposely caused the death or serious bodily injury resulting in death of Jennifer Pizzuto.

If the State has proven to you beyond a reasonable doubt that the defense does not apply and the State has proven all of the elements of murder previously defined

21

A-4978-17

for you beyond a reasonable doubt, then you must find the defendant guilty of murder. <u>If, however, you determine that the State has not proven beyond a reasonable doubt that the defendant purposely or knowingly caused the death or serious bodily injury resulting in death, you must find the defendant not guilty of murder and go on to consider whether the defendant should be convicted of the crimes of aggravated or reckless manslaughter.</u>

[(Emphasis added)]

Defendant argues that these instructions constitute plain error because they do not make clear to the jury that self-induced intoxication is not a defense to the lesser included offenses of aggravated manslaughter and manslaughter, as our Supreme Court explained in <u>Warren</u>, 104 N.J. at 579, and this court subsequently applied in <u>Klich</u>, 321 N.J. Super. at 396. In response, the State argues that the record developed at trial shows there is no rational basis to support a self-induced intoxication charge. Thus, the State contends, the judge's failure to include language that unequivocally states that the self-induced intoxication defense does not apply to the two lesser included offenses is legally inconsequential.

An attorney has a professional obligation to place on the record proper, timely objections in order to facilitate appellate review. <u>R.</u> 1:7-2. Conversely, the trial court has the discretion to "notice any error of such a nature as to have

been clearly capable of producing an unjust result, even though such error was not brought to its attention by a party." R. 1:7-5. Appellate courts also have the authority to reverse a conviction based on any error "that is clearly capable of producing an unjust result." R. 2:10-2.

> In the context of an erroneous jury charge plain error is "[l]egal impropriety in the charge prejudicially affecting the substantial rights of the defendant and sufficiently grievous to justify notice by the reviewing court and to convince the court that of itself the error possessed a clear capacity to bring about an unjust result."
>
> [State v. McKinney, 223 N.J. 475, 494 (2015) (internal citations omitted).]

Here, although the jury charge at issue was drafted and proposed by defendant's trial counsel, the Court made clear in Warren that "[i]t is the duty of the trial court to instruct the jury on the relevant legal principles, 'and counsel may justifiably assume that fundamental matters will be covered in the charge.'" 104 N.J. at 578 (quoting State v. Green, 86 N.J. 281, 288 (1981)).

It is well settled that "[b]ecause proper jury instructions are essential to a fair trial, 'erroneous instructions on material points are presumed to' possess the capacity to unfairly prejudice the defendant." State v. Bunch, 180 N.J. 534, 541-42, (2004), (quoting State v. Nelson, 173 N.J. 417, 422 (2002)). The trial judge has an independent, nondelegable duty to ensure the jury receives accurate

23

instructions, regardless of the parties' charging requests. State v. Scharf, 225 N.J. 547, 580 (2016). As an appellate court, we are bound to review the jury charges as a whole, "not look at portions of the charge alleged to be erroneous in isolation." McKinney, 223 N.J. at 494.

Intoxication "is not a defense unless it negatives an element of the offense." N.J.S.A. 2C:2-8(a). Self-induced intoxication as a defense "means intoxication caused by substances which the actor knowingly introduces into his body, the tendency of which to cause intoxication he knows or ought to know, unless he introduces them pursuant to medical advice or under such circumstances as would afford a defense to a charge of crime. . . ." N.J.S.A. 2C:2-8(e)(2). "As a matter of policy, however, the drafters of the Code concluded that intoxication should not exonerate a defendant from crimes involving recklessness." Warren, 104 N.J. at 576. The Legislature codified the public policy in Warren to avoid any lingering doubt: "When recklessness establishes an element of the offense, if the actor, due to self-induced intoxication, is unaware of a risk of which he would have been aware had he been sober, such unawareness is immaterial." N.J.S.A. 2C:2-8(b).

As in this case, the defendant in Warren did not dispute that he killed the victim. The victim in Warren ended a six-year extramarital romantic

relationship with the defendant when she "threw a caustic substance" at him. 104 N.J. at 573. The incident that ended her life occurred approximately one month later, as she was driving her eight-year-old son to school. When she stopped at a store, the defendant parked his car directly behind hers. As soon as she stepped out of her car, the defendant called her to come over. When she approached the defendant's passenger-side window, the defendant "fired three shots, two of which hit the victim." Id. at 573-74. She died from her wounds. The defendant "drove away from the scene, but was later apprehended." Similar to what occurred in this case, the defendant in Warren gave a statement to the police in which he admitted that he shot the victim and boasted that "he carried out the shooting with 'military precision.'" Id. at 574.

The defendant in Warren was charged with murder. His defense at trial "was that he was so intoxicated at the time of the offense that he was incapable of acting 'purposely' or 'knowingly.'" Ibid. Again, as was the case here, the defendant in Warren did not testify in his own defense. However, his "wife and two of his sons testified about his alcoholism and drunkenness on the day of the shooting." Ibid. According to these witnesses:

> Since 1972, he had been hospitalized several times for alcoholism, most recently at a Veterans Administration hospital from June 6-9, 1983, a week and a half before the shooting. During the day and night before the

25

shooting, defendant had consumed almost three pints of rum and approximately fourteen cans of beer. He went to sleep around 11:30 p.m., awoke at 5:30 a.m., and before leaving the house between 7:00 and 7:30 a.m., drank a substantial amount of rum as well as a "king-size" beer.

[Ibid.]

The trial judge's instructions to the jury in Warren on the self-induced intoxication defense mirrored the charge the trial judge gave here. Writing on behalf on a unanimous Supreme Court, Justice Pollock explained:

> The basic defect in the charge was the failure to relate the defense of intoxication to the lesser included offenses of manslaughter and aggravated manslaughter.
>
> . . . .
>
> Furthermore, the court should have instructed the jury not to consider defendant's intoxication in determining whether he consciously disregarded the risk to the victim, but to view defendant's conduct objectively, as if he were sober, in determining whether he consciously disregarded that risk. By failing to instruct the jury that it could accept defendant's intoxication as a defense to murder and still convict him of manslaughter, the court permitted the jury to believe that defendant's intoxication prevented a conviction for manslaughter. In effect, the court unintentionally prevented defendant's conviction on the lesser included offenses of aggravated manslaughter or manslaughter, and forced the jury to choose between a murder conviction and an acquittal.
>
> [104 N.J. at 578.]

26

As we noted earlier in this opinion, Justice Pollock emphasized in <u>Warren</u> that the trial court is duty-bound to instruct the jury correctly on all relevant legal principles involved in a case. When the trial court fails to explain material issues correctly, we are bound to find plain error "even in the absence of an objection." <u>Id.</u> at 578-79. We confronted equally overwhelming evidence of the defendant's culpability in <u>Klich</u>. Writing for this court, our colleague Judge Donald Collester, Jr., reached the same conclusion:

> We also cannot accept the argument that the omission in the charge was harmless error in light of the strong proof of defendant's guilt for murder. Incorrect jury instructions are poor candidates for rehabilitation under the harmless error doctrine. On the contrary, erroneous instructions on matters material to jury deliberation are presumed to be reversible error in criminal cases.
>
> [321 N.J. Super. at 398 (internal citations omitted)]

Based on the dispositive nature of this error, we need not, and expressly do not reach the remaining arguments raised by defendant in this appeal. We cannot complete our discussion, however, without noting that this legal error could have, and indeed should have been avoided. The Supreme Court's decision in <u>Warren</u> was published thirty-four years ago. Since then, the Court has cited or referred to <u>Warren</u>'s holding concerning the inapplicability of self-induced intoxication to reckless conduct in ten published opinions, most recently

in <u>State v. Baum</u>, 224 N.J. 147, 162 (2016).  This court has cited <u>Warren</u> in fifty-three opinions, fourteen published and thirty-nine unpublished.

We vacate defendant's murder conviction and sentences and remand this matter for a new trial.

Reversed and remanded.  We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION